THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Respondent, v. THE MANHATTAN RAILWAY COMPANY, Appellant.

Under the provision of the act of 1867 (Chap. 489, Laws of 1867) providing "for the construction of an experimental line of railway in the counties of New York and Westchester," which act authorized the W. S. & Y. P. R. Co. to construct an elevated railroad on the route therein specified, and provides (§ 9) that said company shall pay into the city of New York as a compensation for the use of its streets "five per cent of the net income of said railway" derived from passenger traffic, in such manner as the legislature may thereafter direct, the city was given no power to collect the specified percentage under then existing general laws, and until future legislation fixing the manner of payment the company could not be placed in default for refusal to make payment.

*Mayor, etc.,* v. *T. T. S. R. Co.* (113 N. Y. 311), distinguished.

The act of 1868 (Chap. 855, Laws of 1868) entitled "An act supplementary to chapter 489, Laws of 1867, and to provide for the collection and application of revenue in the county of New York in certain cases," is invalid as it is violative of the provision of the Constitution (Art. 3, § 16) requiring that a private or local bill shall embrace but one subject which shall be expressed in its title.

The different parts of said act are so interwoven and dependent one upon the other, that no portion thereof can be upheld after striking out the balance.

The provisions, therefore, of said act which give direction as to the manner of payment of the percentage specified in the act of 1867, fall with it, and standing alone, may not be referred to as the directions called for by said last-mentioned act.

Where, however, it appeared that the corporation named in said act of 1868 availed itself of the extended time given to it by the act in which to construct an experimental section, and after such section had been approved as prescribed, proceeded to construct the railroad along the route provided for in the act of 1867, with another form of motor, however, than that authorized by said act, as permitted by the act of 1868 (§ 1), and also availed itself of the permission given by said act to change its name (§ 5), and executed the bond required by it (§ 3) ; also that all the rights, powers, privileges and franchises of said company were sold on foreclosure of certain mortgages executed by it and the N. Y. E. R. R. Co. became vested therewith, and continued the construction and operation of the road ; that the original company paid the five per cent in the manner prescribed by the act of 1868, and said N. Y. E. R. R. Co. after it acquired title also paid the same down to the passage of the act of 1875 (Chap. 595, Laws of 1875), which confirmed it in the possession and enjoyment of the property purchased, and gave to it certain other rights and privileges, and continued so to do thereafter until it leased the road to defendant, and that defendant continued to make payments of what it claimed to be five per cent of the rental, down to the commencement of this action for an accounting, *held*, that by virtue of these various acts on the part of defendant and its predecessors, and its acceptance of subsequent legislation based on the assumed validity of the act of 1868, there was a waiver of the defense that said act was unconstitutional.

A corporation as well as an individual may waive a constitutional or statutory provision in its favor or for its protection where it is exclusively a matter of private right and no consideration of public morals are involved, and having once done so it cannot subsequently invoke the protection of the provision.

Although said constitutional provision is of a public nature, where an act violative thereof is passed, bearing upon the private rights of individuals or corporations, the constitutional provision becomes as to them one enacted for their benefit, and they may waive the benefit thereof and consent to perform or submit to the requirements of the act, and when once such waiver has been made and consent so given, and the party waiving and consenting has taken benefits granted by the act, such party is forever concluded thereby.

Under the provision of the Rapid Transit Act (§ 36, chap. 606, Laws of 1875), authorizing an elevated railway company, whose railway was then in operation, to construct connections with other railways, railroad depots or ferries, upon routes fixed by the commissioners, upon compliance with "the requirements and conditions imposed by said commissioners," the N. Y. E. R. Co., plaintiffs' lessor, constructed an extension of its route on the east side of the city, known as "the Third Avenue line," connecting with various ferries and railroads, upon routes fixed by the commissioners, and it and defendant have since operated

the same and have paid what was claimed by them to be the per-
centage upon the income derived from the passenger traffic thereon.
Said commissioners exacted from the N. Y. E. R. Co., as a condition
precedent to their laying out any connecting routes, an agreement and
consent to certain conditions imposed by them.    *Held* (ANDREWS, Ch. J.,
GRAY and BARTLETT, JJ., dissenting), that as to such line no lia-
bility to pay said percentage existed; that the words of said pro-
vision of the Rapid Transit Act, permitting the construction of the con-
necting routes, "with all the privileges and with like effect as though
the same had been a part of the original route," are simply a grant of
power, upon conditions imposed by the commissioners, and do not carry
with them the burdens imposed as to the original route; that defend-
ant was not estopped from denying liability because of the payments
previously made by it, and in the absence of some statutory liability,
such as exists as to the original route under the act of 1867, it was not
obliged to pay the percentage in future.

*Mayor, etc.,* v. *T. T. S. R. Co.* (113 N. Y. 311), distinguished.

Defendant set up as counterclaims sums paid by it as damages to
abutting owners.    *Held,* that there was no warranty in regard to the
free use of the streets as against abutting owners, and so the counter-
claims were not allowable.

Also *held,* defendant was not entitled to recover back the sums paid by it
as percentage; that the payments were voluntary and plaintiff was
entitled to retain the same.

(Argued February 5, 1894;  decided June 5, 1894.)

APPEAL from order of the General Term of the Supreme
Court in the first judicial department, entered upon an order
made November 6, 1893, which denied a motion by defendant
for a new trial.

This is an action in the nature of one for an accounting.
The plaintiff demands judgment against the defendant that it
render an account to the plaintiff of its net income arising from
passenger traffic on its railroads since the 5th day of June,
1879, and that it pay to the plaintiff five per cent thereon from
October 1, 1879, after crediting defendant with the amounts
of the quarterly payments actually made by it since that date.
The defendant denies any liability to pay any amount what-
ever, and it also sets up various counterclaims for which it
demands judgment.    The controversy arises respecting what
are termed the Ninth avenue and Greenwich street route,

and also the Third avenue route of railroads operated by defendant in the city of New York. The former is a route on the west side of the city and runs near the borders of the Hudson river, and extends from Battery place on the south to Fifty-ninth street on the north. The latter, or the Third avenue, is an east side route, and the structure thereon was built subsequent to that upon the west side and under a different statute, and for the purpose of forming a connecting route between the Ninth Avenue and Greenwich Street railroad and other steam railways, or the depots thereof, or with steam ferries, pursuant to the thirty-sixth section of what is known as the Rapid Transit Act, being chapter 606 of the Laws of 1875. The railroad that was built upon the east or Third avenue side of the city and in accordance with the routes laid out for it under the act last cited, extends from a connecting point with the Ninth avenue road at the intersection of Greenwich street and Battery place, and thence, after connecting with the South ferry, Hamilton avenue ferry and Staten Island ferry, proceeds northerly through various streets until it reaches Third avenue, and in its progress through these streets and along that avenue towards its terminus at Harlem bridge, it connects with various other ferries across the East river, and also with the Grand Central railroad station at Forty-second street.

The questions arising in the case depend upon various statutes relating to these elevated railroads, and as they are frequently referred to both in the arguments of counsel and in the opinion of the court, it is thought to be matter of convenience to set them out in this statement as fully as may be necessary to a proper understanding of the case. The first act upon the subject was passed April 20, 1866, and forms chapter 697 of the laws of that year. It is an act supplementary to what is commonly known as the General Railroad Act of 1850. It is not necessary to give the text in full, it being sufficient to say that it provided for the formation of a railroad company under the provisions of the act of 1850, and for the purpose of carrying persons and property by means of a propelling rope or cable attached to stationary power. The rate

of fare was fixed at a minimum of ten cents, with a right to not exceeding five cents for each mile, or any portion thereof. Under this act of 1866 the West Side and Yonkers Patent Railroad Company was duly incorporated for the purpose of constructing, maintaining and operating a railway for public use, and for the transportation of persons and property by the means spoken of in the act. The railway was to commence at or near the southerly extremity of the city of New York, and was to extend thence northerly, with one or more branches, parallel or lateral to the main line through the city to the village of Yonkers. The articles of association of this company were duly filed in the office of the secretary of state July 26, 1866. Nothing further had been done under the provisions of this act when chapter 489 of the Laws of 1867 was passed. That act is entitled "An act to provide for the construction of an experimental line of railway in the counties of New York and Westchester." The first section of that act authorized the West Side and Yonkers Patent Railway Company to commence and proceed with the construction of the elevated (so-called) railway, in the counties of New York and Westchester, in the manner and upon the route hereafter specified. The second section provided that the railway should be operated exclusively by means of propelling cables attached to stationary engines placed beneath or beyond the surface of any street through which such railway might pass, and was to be concealed from view, so far as the same might be detrimental to ordinary uses of said street, and provision was made for the kind of structure that was to be built. The third, fourth and fifth sections of that act read as follows :

"§ 3. The said West Side and Yonkers Patent Railway Company are hereby empowered to commence the construction of an elevated railway as aforesaid, at the southerly extremity of Greenwich street, near Battery place, in the city of New York, and extend the same northerly along Greenwich street for a distance of half a mile in length. At or near the center of the same shall be placed a stationary engine, which shall be constructed to operate a series of two lengths of propelling

cable, extending about one-fourth of a mile northerly, and one-fourth of a mile southerly, and put the same in practical operation as contemplated by said company, with a car placed upon said track, loaded to a weight equal to at least three times the ordinary weight of a passenger car proposed to be used thereon with its occupants. When the said experimental section shall be in readiness within ————— the time hereinafter mentioned, the commissioners hereinafter mentioned shall proceed to inspect the said railroad, its structures and operating machinery. Upon due inspection and examination as aforesaid, if the said commissioners shall approve of the structure, plan and operations of the said elevated railway, and shall find that the same can be operated with safety and dispatch, then the said commissioners shall certify to such facts, and shall cause a copy of their certificate of approval to be signed in duplicate, and one copy sent to the governor of the state, who, upon approving the same, shall cause it to be filed in the office of the secretary of state, and a certified copy to be transmitted to the mayor of the city of New York, and thereupon the said West Side and Yonkers Patent Railway Company shall be authorized to extend the line of said railway northerly, as hereinafter provided. But in case the said commissioners shall not approve of said railway, and its plan of construction and operation, they shall, in like manner, sign a certificate of the facts, with an order for the removal of the said railway indorsed thereon, which shall be sent to the governor, and when approved by him, shall be filed with the secretary of state, and a certified copy sent to the mayor of the city of New York, and thereupon the constructing company shall proceed immediately to remove the structure, and shall replace the streets and sidewalks in the same condition as before its erection, and in default of so doing the corporate authorities of the city of New York may cause the same to be done at the expense of the said company.

"§ 4. Upon the compliance of the West Side and Yonkers Patent Railroad Company with the requirement of the preceding sections of this act, and upon the filing of the certifi-

cate of the commissioners approved as aforesaid, in proof of the same, the said company is hereby authorized to extend its line of elevated (so-called) railway as aforesaid, along both sides of Greenwich street to Ninth avenue, and along both sides of Ninth avenue, or streets west of Ninth avenue to the Harlem river.

"§ 5. There shall be three commissioners, of whom two shall be appointed by and continued during the pleasure of the governor, and one by the Croton aqueduct board of the city of New York, whose duty it shall be to cause the inspection of said railway, and filing of certificates thereof, as hereinafter mentioned, and who shall have power, in case of the extension of the line of railway, as specified, to authorize the constructing company to remove any obstructions which may exist along its route, and to direct as to the removal and replacement of awning frames, signs and other local objects, heretofore permitted in the streets along which such railway is to pass. They may designate the point at which staircases may be erected for public access in the streets, to such railway, and where "turn-outs" and connecting tracks between the two tracks along the street may be erected. The said commissioners may also limit the speed to a maximum rate compatible with public safety, at which cars may be propelled upon said railway and may prohibit the erection of any structure in the public streets by said constructing company, which shall be unsafe or unauthorized by this act. Their compensation shall be paid by said company, at the rate of ten dollars per each day of such official service, as sworn to by them, and approved by the governor. A majority of said commissioners shall be competent to act in all cases."

The sixth section is not important. The seventh, eighth, ninth, tenth and eleventh sections read as follows:

"§ 7. It shall be lawful for said constructing company to rent, purchase, or acquire, such buildings or parts thereof as may be convenient for the stations or depots for public access to the contemplated railway, and to hold such real estate and personal property as may be deemed desirable in the location

of the aforesaid route and prosecution of the business connected with such railway, but shall be subject to the liabilities and enjoy the privileges mentioned in the acts before mentioned, granting corporative powers not inconsistent with the provisions of this act, and any private property used or acquired, shall be compensated for by said company under provisions of existing laws, authorizing the formation of railroad companies, and the acquisition of rights of way therefor. The said company may connect with its track upon the northern side of the Harlem river by means of a steam ferry or otherwise, in such manner as the commissioners aforesaid may approve.

"§ 8. The said company shall be authorized to demand and receive from each passenger within the limits of the city of New York, rates of fare not exceeding for any distance less than two miles, five cents; for every mile or fractional part of a mile in addition thereto, one cent. Provided, that when said railway is completed and in operation between Battery place and the vicinity of the Harlem river, the said company may, at its option, adopt a uniform rate not exceeding ten cents for all distances upon Manhattan Island, and may also collect said last-named rate for a period of five years from and after the passage of this act.

"§ 9. The said company shall pay a sum of five per cent of the net income of said railway from passenger traffic upon Manhattan Island, as aforesaid, into the treasury of the city of New York, in such manner as the legislature may hereafter direct, as a compensation to the corporation thereof, for the use of the streets thereof.

"§ 10. The said company shall construct the experimental section herein mentioned within one year from the passage of this act (legal delays excepted), and shall complete the extension thereof as authorized herein, so far as comprised in the limits of the city of New York, within five years thereafter.

"§ 11. The said company shall be liable for, and shall pay all damages which may result to private property, or the owners thereof, by reason of the construction of said road, and before

entering upon the construction of said road beyond the said experimental section of one-half mile, the said company shall file with the comptroller of the state of New York, their bond, with sufficient surety, to be approved by the governor, in the penal sum of five hundred thousand dollars, conditioned for the payment of all such damages as may result from the construction of such road, and for the removal of said railway in the event that the aforesaid commissioners shall so direct, provided that all applications for injunctions in any matter relating to said railway shall be made only to the Supreme Court of this state."

The company did not comply with section 10 of the act of 1867, by finishing the construction of the experimental section mentioned in that act, within one year from its passage. Then, by chapter 855 of the Laws of 1868, it was enacted as follows:

" AN ACT SUPPLEMENTARY TO CHAPTER 489 OF THE LAWS OF 1868, AND TO PROVIDE FOR THE COLLECTION AND APPLICATION OF REVENUE IN THE COUNTY OF NEW YORK, IN CERTAIN CASES.

" PASSED June 3, 1868.

" *The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

" SECTION 1. The time in which the constructing company referred to in section 10 of chapter 489 of the Laws of 1867, entitled an ' Act to provide for the construction of an experimental line of railway in the counties of New York and Westchester,' passed April 22, 1867, to which this act is supplementary, is limited to construct the experimental section and extension thereof, is in addition to the exceptions named, hereby extended six months, and it shall be lawful for experiments to be made, and different forms of application of the propelling cable, or other motor upon such railway, and for the constructing company to adopt such form of motor as the commissioners shall, after due experiment, recommend or approve; and, also, to erect such necessary boiler flues on the line of railway, as shall be approved by the commissioners aforesaid.

SICKELS — VOL. XCVIII.    2

" § 2. In pursuance of section nine of the act aforesaid, it is hereby directed that the said construction company, or its successors, shall, in the month of January in each year, and quarter-annually thereafter, pay to the comptroller of the city of New York, five per cent of its net income, for the purpose of being expended in the improvement of the condition or appearance of the streets, or parts of streets or avenues, or places through which said railway shall be constructed ; by preserving or transplanting shade trees, or by other embellishments or improvements of awnings and sidewalk structures which may tend to render the general condition and appearance of the streets aforesaid satisfactory to the citizens dwelling in or frequenting the same. To this end the commissioners aforesaid shall have power to expend revenues received from the specified percentage in such manner as they shall deem best to promote the object aforesaid, subject to the official approval of the mayor of the city of New York. The comptroller of said city is hereby directed to keep said revenue distinct and apart from all other funds ; and to pay out of it warrants when signed by the commissioners, and accompanied by vouchers for the expenditures indorsed as approved by the mayor ; and the vouchers for the compensation of the commissioners, when approved by the governor, shall also be paid from the same fund in like manner. The vouchers aforesaid shall be filed and remain open to public inspection, the same as if for other public expenditures.

" § 3. It shall be the duty of the constructing company aforesaid, before opening its railway to public use, to file with the comptroller of the city of New York, in form to be approved by the mayor of the city of New York, its bond in the penal sum of $100,000, conditioned upon the true and faithful payment of the revenue, in amount and manner specified in the preceding section, and the payment thereof shall be the legal compensation in full for the use and occupancy of the streets by said railway as provided by law, and shall constitute an agreement in the nature of a contract between said city and constructing company, entitling the latter or its successors to

the privileges and rates of fare heretofore or herein legalized, which shall not be changed without the mutual consent of the parties thereto as aforesaid ; and the mayor, in behalf of said city, may, in case of any default in payment as aforesaid, sue for and collect at law any arrearages in such payment, and the claims of the city therefor shall constitute a lien on the railway of said company, having priority over all others.  *Provided,* That it shall not be lawful for the corporate or other authorities to authorize or permit any structures or thing which, by crossing or overhanging the track of such elevated railway or otherwise, shall impede or endanger its use for its public transit purposes.

"§ 4. The compensation mentioned in the preceding section shall be considered as covering all claims for removal of obstruction or structures found upon the street line of said railway, owned by companies or individuals, and where awnings or other structures are thus removed, they shall be replaced only on permit of the commissioners, under such general rules and regulations as they shall adopt in the plans for improving the condition or appearance of the streets as aforesaid ; provided that where vaults have been placed beneath the surface of the streets by owners of adjoining property, under permit of corporate authorities, and the payment of a consideration to the city for such privilege, in such cases and not otherwise, the constructing company shall pay the actual cost of the improvements made as aforesaid, before occupancy, or in *pro rata* proportion for any part thereof ; provided, also, that injunctions issuable against said company under provisions of section 11 of the act aforesaid shall be upon notice, and preliminary hearing in legal form and not otherwise.

"§ 5. The said West Side and Yonkers Patent Railway Company may, before further extensions, or the issuance of its stock or securities, file supplementary articles of association in the office of the secretary of state, for the purpose of amending its corporate name, or title, and it shall be known by the amended name, or title, stated in supplementary

articles aforesaid, when signed by a majority of the original corporators and attested by the signatures of its president and secretary, under its corporate seal, without prejudice to its rights, franchises or contracts, to the same effect, as if the amended name had been adopted in the original articles, and referred to by law.

"§ 6. The legislature may, at any time, alter, modify or repeal this act.

"§ 7. This act shall take effect immediately."

The commissioners provided by section 5 of the Laws of 1867, to be appointed by the governor and the Croton aqueduct board of the city of New York, had been duly appointed, and in 1868 had inspected and examined the experimental line of railway as authorized by the act of 1867 and made their certificate in writing that they approved of the structure, plan and operation of the railroad. This certificate was approved by the governor on the 2d of July, 1868, and filed in the office of the secretary of state. This experimental line was then proceeded with and its construction extended north through Greenwich street and Ninth avenue to Thirtieth street, where it connected with the Hudson River railroad, and no further construction was proceeded with thereafter for nearly ten years.

The New York Elevated Railroad Company, having been incorporated under the General Railroad Act of 1850, for the purpose of constructing and operating a railroad from the Battery in the city of New York, upon a line through the westerly part of the city to Westchester county, purchased, on the foreclosure and sale of the property of the West Side Company above mentioned, all the rights, powers, privileges and franchises which had belonged to and were vested in and held and enjoyed by that company, and more particularly specified in the judgments of foreclosure entered in New York on the 22d of August and 8th of September, 1871, respectively. The conveyances and transfers were duly made pursuant to the judgment of sale to the New York Elevated

Railroad Company. Soon after this sale the company com-
menced to operate the railroad from Battery place along
Greenwich street and Ninth avenue to Thirtieth street, and it
was operating such road under and by virtue of these trans-
fers of the rights, property and franchises of the old West
Side road to it, when the two acts of June 17 and June 18,
1875, were passed.

Chapter 595 of the Laws of 1875, passed June seven-
teenth, is as follows:

"AN ACT TO AUTHORIZE AND REQUIRE THE NEW YORK ELEVATED
RAILROAD COMPANY TO CONTINUE AND COMPLETE ITS RAIL-
ROAD IN THE CITY OF NEW YORK, AND TO REGULATE THE CON-
STRUCTION, OPERATION AND MANAGEMENT THEREON.

"PASSED June 17, 1875.

" *The People of the State of New York, represented in
Senate and Assembly, do enact as follows :*

" SECTION 1. The New York Elevated Railroad Company,
organized, incorporated and existing under and by virtue of
the provisions of an act of the legislature of this state, entitled
'An act to authorize the formation of railroad corporations,
and to regulate the same,' passed April second, eighteen hun-
dred and fifty, and the laws amendatory, and in addition
thereto, having acquired by purchase under mortgage fore-
closure and sale, and other transfer, all the rights, powers,
privileges, and franchises, which were conferred upon 'The
West Side and Yonkers Patent Railway Company,' in and
by an act of the legislature of the state, entitled 'An act to
provide for the construction of an experimental line of rail-
way, in the counties of New York and Westchester,' passed
April twenty-second, eighteen hundred and sixty-seven; and
in and by an act entitled 'An act supplementary to chapter
four hundred and eighty-nine of the laws of eighteen hundred
and sixty-seven, and to provide for the collection of revenue
in the county of New York, in certain cases,' passed June
third, eighteen hundred and sixty-eight, is hereby confirmed
in the possession and enjoyment of the said rights, powers,
privileges, and franchises, as fully and at large as they were so

granted, in and by the acts aforesaid, to the said 'West Side and Yonkers Patent Railway Company,' provided always that nothing herein contained shall impair any legal or equitable rights or remedies remaining in said West Side and Yonkers Patent Railway Company, or any stockholder, or creditor thereof.

"§ 2. The said New York Elevated Railroad Company is hereby authorized and required to construct and complete at least one track, with turn-outs, and side tracks, of its elevated railroads, at any time within five years after the passage of this act (unless delayed by legal proceedings or some authority beyond the control of the company), along and over the streets and places specified and permitted in the aforementioned acts in the mode, manner and form prescribed by said acts, except as herein otherwise provided.

"§ 3. The commissioners appointed under and by virtue of the provisions of the aforesaid 'An act to provide for the construction of an experimental line of railway in the counties of New York and Westchester,' are hereby continued with the same authority, powers and duties in respect to the said New York Elevated Railroad Company as are in, and by said acts hereinbefore mentioned, conferred upon them in respect to the said 'West Side and Yonkers Patent Railway Company.' All vacancies occurring in said commission by death, resignation or otherwise, shall be filled by the governor. The compensation of the commissioners shall be ten dollars each, for each day's service, to be paid by said company on proper vouchers rendered.

"§ 4. The said New York Elevated Railroad Company may make and adopt such alterations and improvements in the structure, rolling stock, motor power and its application, and in the position, grade, elevation and depression of the tracks and the mode of securing and strengthening its said railroads, sideways, crossings, stations and turn-outs as the said commissioners, or a majority of them, may authorize or approve; except that on places south of Ninety-ninth street the track shall not be less than fourteen feet above the surface of the

street.   And the location of the lines or routes not specifically located by law, and the position and construction of the tracks, side tracks, turn-outs, stations and other structures which said company is or may be authorized by law to construct, may be such as said company may adopt and the said commissioners approve.

" § 5. In and through that section of the city of New York, where, by the provisions of section four of the aforesaid act (chapter four hundred and eighty-nine of the laws of eighteen hundred and sixty-seven), the said railroad company is authorized to locate its roadways, tracks, stations, turn-outs and crossings 'along Ninth avenue or streets west thereof,' the particular location, form and structure and number of tracks and grades, elevations and depression thereof, may be such as the commissioners aforesaid, or a majority of them, shall designate and approve.

" § 6. The said company may demand and receive from each passenger on its railroad, not exceeding ten cents for any distance of five miles or less, and with the assent required by section three of chapter eight hundred and fifty-five of the laws of eighteen hundred and sixty-eight not exceeding two cents for each additional mile or fractional part thereof.

" § 7. This act shall not be so construed as to authorize the building or extension of their said road through, along or upon any streets or avenues, except along Greenwich street to Ninth avenue, and along Ninth avenue or streets west of Ninth avenue to the Harlem river, as authorized by section four of chapter four hundred and eighty-nine of the laws of eighteen hundred and sixty-seven.

" § 8. The said company shall construct and complete one track with sidings and turn-outs of its railway along its established route as far north as Central Park, within eighteen months from the passage of this act, necessary and unavoidable delays from the pending of legal proceedings excepted.

" § 9. All acts and parts of acts inconsistent with this act are hereby repealed.

" § 10. This act shall take effect immediately."

The other act is chapter 606 of the Laws of 1875, and is what is termed the General Rapid Transit Act. Those provisions which are regarded as material are referred to in the. opinion, and it is not necessary to here set them out.

Other facts appear in the opinion.

*John F. Dillon* and *Julien T. Davies* for appellant. No· liability to plaintiff has ever been imposed upon the defendant, because the act of 1867 is, by its terms, inoperative, in the absence of further legislation, and because the act of 1868· is plainly unconstitutional. (*Ode* v. *M. R. R. Co.*, 56 Hun, 199.) The learned trial judge erred in holding that the act of 1867 imposed an immediate enforcible liability upon the company to pay a percentage to the city. (Endlich on Interp.. Stat. §§ 23, 29, 72, 499; *People* v. *Hills*, 35 N. Y. 449; *Tingue* v. *Village of Portchester*, 101 id. 294; *People·* v. *Briggs*, 50 id. 553, 561; *Astor* v. *A. R. Co.*,. 113 id. 93; *In re· N. Y. E. R. R. Co.*, 70 id. 327; Cooley on Const. Lim. [5th ed.] 178, 212–214; *Warren* v. *Mayor, etc.*, 2 Gray, 84; *Huber* v. *People*, 49 N. Y. 132;. *Johnston* v. *Spicer*, 107 id. 185; *People* v. *Whitlock*, 92 id. 191.) The learned trial judge erred in construing the 9th. section of the act of 1867 and the last clause of section 36 of the Rapid Transit Act of 1875 liberally in favor of the city,. and with artificial strictness against the defendant. (*S. R. T. Co.* v. *Mayor, etc.*, 128 N. Y. 510; *C. R. Bridge* v. *W. Bridge*, 11 Pet. 420; *O., etc., Co.* v. *Debolt*, 16 How. [U. S.] 416, 435; *D., etc., R. R. Co.* v. *Litchfield*, 23 id. 66, 88.)· If the defendant is liable at all, it is only for five per cent of the net income of those railways which were authorized and· built under the act of 1867. The new franchise for the Third Avenue line conferred by the Rapid Transit Act through the· action of the mayor's commissioners was a fresh grant by legislative authority and did not subject that line to the liabilities which the act of 1867 imposed upon the Greenwich· Street or Ninth Avenue line. (*In re N. Y. E. R. Co.*, 70 N. Y. 337; *S. A. R. Co* v. *G. R. Co.*, 3 Abb. [N. C.] 387.) The·

last clause of section 36, chapter 606, Laws of 1875, is violative of section 17 of article III of the State Constitution, and is, therefore, wholly invalid. (*People* v. *Hoyt*, 7 Hun, 69; *People* v. *Banks*, 67 N. Y. 575.) Any liability upon the New York Company to pay on its Third Avenue line five per cent under the acts of 1867 or 1868, or June 17, 1875, is inconsistent with the terms and conditions under which the board of rapid transit commissioners authorized the construction of the Third Avenue line, and with the consent of the city thereto. (*In re N. Y. E. R. R. Co.*, 70 N. Y. 352.) Even if the defendant's liability covers the Third Avenue line also, there has been full payment, and a judgment for an accounting must be denied. (Cook on Stock & Stockholders [3d ed.], § 546; *Van Dyck* v. *McQuade*, 86 N. Y. 38, 47; *Williams* v. *W. U. T. Co.*, 93 id. 162, 191; *Phillips* v. *E. R. R. Co.*, 138 Mass. 122; 94 U. S. 505; *N. Y., etc., R. R. Co.* v. *Nickals*, 119 id. 302; *People* v. *Suprs.*, 4 Hill, 20, 23.) The recently consummated merger of the New York and Manhattan companies has no bearing upon the issues in this case. (*Tomlinson* v. *Branch*, 15 Wall. 460; *C. R. R. & B. Co.* v. *State of Georgia*, 92 U. S. 665; *C. & O. R. Co.* v. *Virginia*, 94 id. 718; *Tennessee* v. *Whitworth*, 117 id. 139; *Fisher* v. *N. Y. C. R. R. Co.*, 46 N. Y. 644.) There has been a complete failure of consideration for the contract under which alone defendant could be required to make these payments if the act of 1868 is valid. (*Powers* v. *M. R. Co.*, 120 N. Y. 178; *Ode* v. *M. R. Co.*, 56 Hun, 199.) The defendant should have judgment against the plaintiff upon one or more of its counter-claims. (*Taylor* v. *Mayor, etc.*, 82 N. Y. 10; *Powers* v. *M. R. Co.*, 120 id. 178; *Kane* v. *N. Y. E. R. Co.*, 125 id. 164; *Stone* v. *Frost*, 61 id. 614; 1 Spence Eq. 632, 633; Bisp. Eq. §§ 185–188; *In re S. L. Ass. Co.*, 2 J. & H. 408; L. R. [9 Ch. App.] 609; *Daniel* v. *Sinclair*, L. R. [6 App. Cas.] 190; Story's Eq. Juris. § 212a; *Cooper* v. *Phibbs*, L. R. [2 H. L.] 149; 17 Ir. Ch. 79; *Stone* v. *Godfrey*, 2 DeG., M. & G. 76.) The remedy of the city is at law and not in equity. This point

is supported by the express language of the very section of the act of 1868 which, if constitutional, is the basis of this action. (Laws of 1868, chap. 855, § 3.)

*David J. Dean* for respondents. The charter obligations and duties of the New York Elevated Railroad Company, which the defendant has assumed, and is in law bound to discharge, included the payment to the plaintiff of five per cent of net income as claimed in the complaint of both the Third and Ninth Avenue lines. This is true as to the Ninth Avenue route of railway by reason of the charter rights and powers and charter obligations and duties relating thereto. (*Taggart* v. *Murray*, 53 N. Y. 233; *People ex rel. Mason* v. *McClave*, 99 id. 89; *Bell* v. *Mayor*, 105 id. 139; *Mayor* v. *T. A. R. Co.*, 16 N. Y. S. R. 122; *Walter* v. *Newbach*, 47 Hun, 166; 114 N. Y. 36; *People ex rel.* v. *Lacombe*, 99 id. 43; *Mayor, etc.*, v. *D. D., etc., R. R. Co.*, 47 Hun, 199; 112 N. Y. 141; *Mayor, etc.*, v. *B., etc., R. R. Co.*, 97 id. 275; *Mayor* v. *E. A. R. R. Co.*, 43 Hun, 618; *Mayor* v. *T. T. S. R. R. Co.*, 113 N. Y. 311; *T. Co.* v. *Illinois*, 96 U. S. 63; *C. M. Co.* v. *State*, 144 id. 550.) Defendant is estopped from claiming that the act of 1867 never became operative. (*McKeen* v. *Delancy*, 5 Cranch [U. S.], 22; *Fort* v. *Burch*, 6 Barb. 60–73; *DuBois* v. *Brown*, 1 Dem. 317; *Power* v. *Village of Athens*, 26 Hun, 287; 99 N. Y. 592; *Westbrook* v. *Miller*, 56 Mich. 148; *Heath* v. *Wallace*, 138 U. S. 573; *U. S.* v. *A. R. Co.*, 142 id. 615.) Any uncertainty in the act of 1867 was cured by chapter 595 of the Laws of 1875, which ratified and confirmed chapter 855 of the Laws of 1868. (*Mayor, etc.*, v. *T. T. S. R. R. Co.*, 113 N. Y. 311.) Defendant is liable for five per cent of the net income of the Third Avenue route or railway. (*P. R. T. Co.* v. *Dash*, 125 N. Y. 104; *In re E. R. R. Co.*, 70 id. 336; *Mayor, etc., B. R. R. Co.*, 97 id. 282; *Mayor, etc.*, v. *D. D., etc., R. R. Co.*, 112 id. 141; *Mayor, etc.*, v. *E. A. R. R. Co.*, 43 Hun, 50; *People* v. *O'Brien*, 111 N. Y. 1; *Mayor, etc.*, v. *T. T. S. R. R. Co.*, 113 id. 317.) The defendant having received and retained to and for the

use of the plaintiff five per cent of the net income of both the Ninth and Third Avenue railways, from passenger traffic upon these railways, may be required to account in equity for the moneys so had and received. (*Marvin* v. *Brooks*, 94 N. Y. 75, 76; *Moxon* v. *Bright*, L. R. [4 Ch. App. Cas.] 292; *Foley* v. *Hill*, 2 H. L. Cas. 28; *Marston* v. *Gould*, 69 N. Y. 225; 1 Story's Eq. Juris. § 463; *Shephard* v. *Brown*, 4 Gifford, 208; *Hemings* v. *Pugh*, Id. 456.) Defendant's counterclaims should be disallowed. (*Redmond* v. *Mayor, etc.*, 125 N. Y. 632; *Brisbane* v. *Dacre*, 5 Taunt. 53; *Sillman* v. *Wing*, 7 Hill, 159; *Preston* v. *Boston*, 12 Peck, 14; *Tripler* v. *Mayor, etc.*, 125 N. Y. 617; *Dugan* v. *B. Co.*, 27 Penn. St. 303; *People* v. *Kerr*, 27 N. Y. 188; *Kellinger* v. *R. R. Co.*, 50 id. 206; *Kane* v. *M. E. R. R. Co.*, 125 id. 124; *Mayor* v. *B. R. R. Co.*, 97 id. 282; *Mayor* v. *T. T. S. R. R. Co.*, 113 id. 311; *Story* v. *N. Y. E. R. R. Co.*, 90 id. 122; *Lahr* v. *M. E. R. Co.*, 104 id. 268; *Mayor, etc.*, v. *E. A. R. R. Co.*, 43 Hun, 50.) Defendant cannot be relieved from its alleged mistake of law. (*Story* v. *N. Y. E. R. R. Co.*, 90 N. Y. 143.)

PECKHAM, J.   The foundation of the plaintiff's claim in this action rests upon section 9 of the act of 1867.

That section provides for the payment of five per cent of the net income of the railroad company into the treasury of the city "in such manner as the legislature may hereafter direct, as a compensation to the corporation thereof, for the use of the streets thereof." The act provided for the construction in the first instance of an experimental elevated railway to be operated exclusively by means of propelling cables attached to stationary engines, for a distance of half a mile along the southern extremity of Greenwich street. The corporation was given, by the tenth section of the act, one year in which to construct the experimental section, and after its completion it was to be inspected by the commissioners provided for in the act, and if they approved it was then to be built within five years of that time along Greenwich street to Ninth avenue, and

along that avenue or streets west of it to the Harlem river.   It is plain, therefore, that there was no idea that the railroad would be ready for business or put in operation prior to another annual session of the legislature.   Indeed the probabilities for even a later period 'would seem to have been very strong.   It follows that it was not important to state in the statute then passed when or in what manner the five per cent should be paid by the corporation then empowered to go on and construct within the year an experimental section of railroad.   That detail might safely be left for future legislation.   But as the corporation was given by the act various powers and privileges, it was certainly appropriate, even though not necessary, to state the burdens or conditions which were to be imposed upon the corporation in return.   If not stated at that time, there might be given an improper force to the argument against the imposition of any other or greater burdens in the future than were contained in the act of 1867.   Hence, the statement of the condition as to the five per cent.   The burden was plainly and in terms imposed, but the time and manner of payment were just as plainly stated to be as the legislature should thereafter direct.   Why the manner of payment should have been deferred for future direction by the legislature is a question not now easily answered; yet the fact that it is so deferred by the act of 1867 is as definite and clear as language can make it. The language is so plain and peremptory that unless it is wholly rejected as meaningless, the only effect that can be given to it is to put off the immediate obligation to pay until the legislature at some future time gave directions upon the subject.

It is a waste of time to cite the general canons of construction which obtain in the discharge of the judicial duty to construe an act of the legislature.   They are familiar to us all and they result in the question, what is the real meaning of the enacting body?   That meaning is to be first sought in the language used, and if that be plain, unambiguous and imperative, there is nothing left for the courts other than to obey the directions of the statute as manifested by its language.   There-

is nothing necessarily unconstitutional or otherwise illegal even
in an absurd statute, although a proper respect for the legisla-
ture will prevent any court from lightly imputing absurdity to
any legislative enactment.    Effect must be given to the whole
of the language used, if it be plain and do not lead to anything
manifestly so unjust or absurd that it cannot be assumed the
legislature really intended such result.    This statute, as we con-
strue its plain language, contains nothing that is either absurd
or unjust.    In this case the counsel for the city claims that the
language providing that the five per cent shall be paid in such
manner as the legislature may thereafter direct, is unimportant
and the corporation may be required to pay without such sub-
sequent direction.    It is said that the city has and always has
had ample provision by general laws for the payment, receipt
and disbursement of all its revenues and under proper safe-
guards and securities, and that this five per cent could, ever
since the amount was imposed by the act of 1867, have been
properly collected and disbursed under those laws.    I have no
doubt of the existence of laws of this nature as claimed by
the learned counsel, and if the statute of 1867 had provided
that this five per cent should be paid to the city in the same
manner, at the same time and be disbursed for the same pur-
poses that its other general revenues were, the railroad corpo-
ration would have been liable and obliged so to pay that sum.
But these facts must be supposed to have been within the
knowledge of the legislature when it passed this act, and it is
plain that the facts did not furnish to it reasons appropriate
for enacting that the payments should be made in the manner
so provided by those laws.    On the contrary, the legislature,
by enacting another provision in regard to the manner of pay-
ment, must be held to have distinctly refused to provide for a
payment in accordance with existing provisions.    Instead of
that, it says the payment shall be made in the manner in which
the legislature may thereafter direct.    If nothing further were
done or directed, and the company should have organized and
built and operated its road and refused to pay the five per
cent, it is quite clear to me that the company could not be

placed in default because of such refusal, and that no action could be maintained against it to recover such amount until the legislature had given directions upon the subject. When the corporation, in the course of operating its road, should receive a fare, the city would not thereby have a title to five per cent thereof, nor would such five per cent be the property of the city while it remained in the treasury of the railroad company. The five per cent which the railroad must pay is that proportion of the net income of the corporation, and what that sum may be is, of course, the result of an inquiry into expenses, which must result in the further inquiry as to what are expenses or other proper deductions from the main sum before the net income is arrived at. This inquiry is absolutely necessary, and the point is how often and upon what actual basis shall it be made. It is wholly unlike the case of *Mayor, etc.,* v. *Twenty-third Street Railway Company* (113 N. Y. 311), which provided for the payment of a percentage of the gross receipts of the company.

In any view that may be taken, I am unable to construe this act of 1867 other than according to its plain meaning, and then it appears that as to the manner and time of payment of this percentage, the legislature has said that it should be as it should thereafter direct.

In this condition of affairs the legislature, by chapter 855 of the Laws of 1868, passed an act by the second section of which it is conceded that directions were given for the manner (and time) of the payment of this five per cent on the net income of the corporation. This act has been held unconstitutional by the courts below because passed in violation of section 16 of article 3 of the Constitution, which provides that no private or local bill shall be passed which shall embrace more than one subject and that shall be expressed in its title. *In the Matter of New York Elevated Railroad Company* (70 N. Y. 327, 336) EARL, J., referred to this act and, while believing the objection to it to be well founded, assumed without deciding that it was unconstitutional and then quoted the act of 1875 (Chapter 595) as curing any defect

which the company might otherwise have suffered from because of this invalidity of the 1868 statute.

It was not held that the act of 1875 validated the unconstitutional act of 1868, or otherwise infused life into it. It was simply held that the act of 1875 by force of its own provisions supplied any defect which existed by reason of the invalidity of that of 1868.

We think the courts below were right in holding that the act of 1868 was invalid for the reason that it violated the constitutional provision already referred to. The whole act is so inseparable, its different parts are so interwoven and dependent one upon the other that the attempt to uphold any portion after striking out the other would be a hopeless undertaking. It cannot be supposed that one part would have been enacted with the other portion left out, and the invalidity of a portion carries down with it the balance of the act. In truth the first part of the title of the act is insufficient to express any subject whatever, as has been already held. (*People* v. *Hills*, 35 N. Y. 449; *People ex rel.* v. *Briggs*, 50 id. 553, 561.) The second portion of the title, that which relates to the application of revenue in the county of New York, is misleading and wholly insufficient as an expression of the subject of the act. It gives a very false idea as to the subject and nature of the legislation actually embodied in the bill. Taking the title in detail and as a whole, it appears to us to be a plain violation of the Constitution.

Standing alone we are compelled to hold that the directions given by the Legislature, in an act which is wholly unconstitutional, cannot be referred to as the directions called for by the act of 1867. There are, however, other facts to be yet alluded to. It would seem that the corporation named in the act of 1868 proceeded to avail itself of the extended time given it thereby, in which to construct the experimental section provided for in the third section of the act of 1867, and after such experimental section had been approved by the commissioners appointed under that act (1867), which approval was in July, 1868, the company further proceeded

towards the construction of the railroad along the route provided for in section 4 of the act of 1867. But the construction of the railroad was not, as to motor power, a compliance with section 2 of the act of 1867, inasmuch as, by the plan adopted and approved by the commissioners above mentioned, the railroad was not to be operated exclusively or at all by means of propelling cables attached to stationary engines, but, on the contrary, the plan actually adopted and carried out was that which was approved by the above commissioners under the provisions of section 1 of the act of 1868. That act permitted the company to adopt any other form of motor which might be approved by the commissioners appointed under the act of 1867, and the form actually adopted was carried out in the construction of the road by the company; and this construction has been permitted by the state and the city authorities, all parties then assuming the validity of the act. The company also availed itself of the permission to change its name, granted by the fifth section of the act of 1868, and in July, 1868, it filed for that purpose supplementary articles of association in the office of the secretary of state. It also, and on or about September 1, 1868, made and executed the bond of $100,000, provided for in section 3 of the same act, and on or about September 18, 1868, it executed the bond provided for in section 11 of the act of 1867.

Prior to 1871 the corporation, by two several mortgages, mortgaged its property, franchises and rights for the purpose of constructing and equipping the railroad from the Battery along Greenwich street and Ninth avenue to Thirtieth street. These mortgages were duly foreclosed, and by virtue of the sale made under and pursuant to the judgments of foreclosure entered in August and September, 1871, and the conveyances and transfers duly made pursuant thereto, the New York Elevated Railroad Company acquired all the rights, powers, privileges and franchises which had belonged to or were vested in and held and enjoyed by the companies described in those judgments and in the acts of 1867 and 1868. The New York Elevated Railroad Company had been incorporated under the

General Railroad Act of 1850 and the several acts amendatory thereof, for the purpose of operating, etc., a railroad from the Battery through the westerly part of the city to Westchester county and thence to Putnam county, and its articles of association were filed in the office of the secretary of state about October 27, 1871. . Subsequent to the conveyances just mentioned the New York Elevated Railroad Company continued the construction of the railroad from the south end of Greenwich street along through the same to Ninth avenue, and along Ninth avenue to Sixty-first street with the acquiescence of the state and city authorities, and such railroad was in operation as an existing elevated railroad prior to the passage of either of the acts of 1875, hereafter mentioned.

Prior to the time when the defendant took possession of the Ninth avenue line (in 1879), and while the road was operated by the other companies, they did not question the obligation to pay this five per cent, but, on the contrary, it was paid quarterly to the city. In 1875 the act (Chap. 595) was passed. The New York Elevated Company was by the first section of the act confirmed in the possession and enjoyment of all the rights, powers, privileges and franchises as fully and at large as they were granted in and by the acts of 1867 and 1868 to the predecessor company. The fourth section gave the company power to adopt certain alterations in the motor power, as the commissioners under the act of 1867 should authorize or approve. By the sixth section of the act of 1875, the company was empowered to demand and receive certain rates of fare from passengers carried on its railroad, and with the assent required by the third section of the act of 1868, a sum not exceeding two cents for each mile or fractional part thereof over five miles. The New York Elevated continued the payment of the five per cent after this act of 1875 was passed and down to the time of the execution, in 1879, of the lease by it to the defendant, and the defendant, during all the time of the existence of such lease, paid to the city treasury what it alleged to be five per cent on the rental of the New York Elevated Company. After the surrender of the old and the execution of a new lease, and up

to the commencement of this action, the defendant has paid what it claimed was five per cent of the amount of the rent secured by the lease.

The question is whether, by virtue of these various actions of defendant and its predecessors, together with the acceptance of subsequent legislation on the subject, based upon the assumed validity of the act of 1868, there has not been a waiver of the defense that the act was unconstitutional. Persons, or corporations even, may waive in some matters, and upon some occasions, a constitutional or statutory provision in their favor. (*Embury* v. *Conner*, 3 N. Y. 511; *In re Application of Cooper*, 93 id. 507–512; *In re Petition of R. R. Co.*, 98 id. 447–453; *Sentenis* v. *Ladew*, 140 id. 463–466.) In the last-cited case it is said : " A party may waive a rule of law, or a statute, or even a constitutional provision, enacted for his benefit or protection, where it is exclusively a matter of private right, and no considerations of public morals are involved, *and having once done so he cannot subsequently invoke its protection*." Although the provision as to a local act containing but one subject, which shall be expressed in its title, is of a public nature and was placed in the Constitution for the purpose of preventing surprises as to the object and purpose of any proposed legislation, yet when an act has been so passed, and its enactments bear upon the private rights of an individual, the constitutional provision then becomes as to him, one which is, within the meaning of the expression, enacted for his benefit, and it is then a matter which such individual may, as to his private rights, waive the benefit of, and consent to perform or submit to the requirements of the act, the same as if the constitutional provision had not been violated. And when once such waiver has been made and such consent been given, the party so waiving and consenting is forever concluded thereby. Especially should this be so where the party takes benefits granted by the act. But for the defect in the title of the act of 1868 it must be conceded that a sufficient direction as to the manner of payment of the five per cent was given by that act. The burden of payment

had been already placed upon the company by the act of 1867, and it was therein declared that it should pay this per cent of its income to the city as a consideration for the use of the streets.   The time and manner of such payment were left for future legislation, and when the act of 1868 gave these directions we see no reason, in the nature of the subject, why the company could not waive the defense that the legislation was void and proceed to recognize and obey it to the same extent as if it were valid.   The company availed itself of the extension of time granted it for the construction of its road under the first section of the act and changed its motor power and constructed its road as therein permitted and under the acquiescence of all the public authorities, and it also changed its corporate name by virtue of another section of the act, and it or its successor paid the five per cent of its net income as provided for in the second section of the same act.   Is not this a waiver of any defense to the further payment of the percentage founded upon the unconstitutionality of the enactment?   What is it other than a recognition by the company of the sufficiency of the directions and a final and full consent to recognize the obligation to pay thereafter and to put aside and waive the defense that the legislature had not yet spoken as provided for in the act of 1867?   Under these circumstances it ought to be held estopped from setting up thereafter a defense grounded upon the invalidity of an act by virtue of some provisions of which and by the consent and acquiescence of all the public authorities, state and city, it had proceeded to change its motor power, construct its road and change its name.   Further than this, the predecessor of the defendant accepts the act (Chap. 595 of the Laws of 1875) in which the act of 1868 is referred to as if it were a valid enactment, and while availing itself of the provisions of this act of 1875, the defendant's predecessor continues payment of the percentage in the time and manner provided in the act of 1868.   All the foregoing conduct must be regarded as a waiver of a constitutional provision which would otherwise operate, if insisted upon, in favor of defendant, and it must be held that the

defendant has duly consented to the binding force of the directions of the act.

It is said that if the defendant be held to the waiver of the defense of invalidity as to the act of 1868, it must be granted the rights as well as be saddled with the burdens of the act. If this be assumed as a correct statement it will be difficult to point out any rights belonging to the railroad company which are not now assured to it outside of that act. The rights or privileges spoken of in the first section of the act of 1868 have been practically covered and provided for by the act of 1875, and if without the benefit of the act of 1868 it might have been urged prior to the passage of the act of 1875 that the company had forfeited its right to build the road because of the time limit in the act of 1867, and was also building it for use by an unauthorized motor, it is clear that the act of 1875 by its provisions recognizes and validates the right to build the road and to use such motor, and it gives further directions in regard to it. It is the second section of the act of 1868 which has been complied with by defendant and which provides for the payment of the percentage. It is true it is also provided in the following section that the rates of fare theretofore or therein legalized are not to be changed without the mutual consent of the parties, and it would appear that the rates never have been changed without such consent. There is nothing else in the act which the defendant or its predecessors would have to depend upon for their rights or privileges. The consideration, as stated in the third section of the act of 1868 for the payment of the five per cent, is the use of the streets by the railroad as provided by law. The ninth section of the act of 1867 stated the same consideration for the exaction. In neither act did it appear that the compensation was to be for the use of the streets as against any one but the city, and the eleventh section of the act of 1867 provided otherwise. If all rights and privileges spoken of in the act of 1868 were necessarily brought into full life and vigor by holding that defendant had waived a defense founded upon the invalidity of that act, there would be no valuable

franchise thereby renovated and brought into active existence for the benefit of the defendant.   It is not necessary, however, to say what the effect of our holding may be upon the rest of the act.

The burden of paying the five per cent was imposed upon the corporation by the act of 1867, and that obligation has been a valid and subsisting one ever since the passage of that act. It was not a creation of the act of 1868, for that act simply gave formal directions in regard to the manner in which a previously existing legal obligation should be discharged.   We hold now that the defendant and its predecessors, by reason of their acts of payment and the acceptance of some of the privileges conferred by the act of 1868, and also by reason of its accepting the provisions in its favor already spoken of as given by the act of 1875, and the payments of the moneys up to the time of the commencement of this action, have waived and are estopped from setting up any objection that might otherwise have been offered to the provisions of the second section of the act of 1868, so far as they provide for the manner and the time of the payments of the five per cent imposed upon the defendant's predecessor as a burden by the ninth section of the act of 1867.   This waiver having once been made, operates effectually for the future as well as for the past. It is an answer to the alleged illegality of the statute when such illegality is set up as a defense to an action to enforce payment of the percentage in the manner prescribed in such act.   It is just as potent in such case as it would be if interposed to a claim to recover back moneys already and actually paid according to the terms of the act.

Nor can it be said that the payments can operate only as a recognition of liability to the extent that they were made. The liability is to pay a sum of five per cent of the net income, and the defendant recognizing its liability has paid a sum which it alleges satisfies that requirement.   The plaintiff denies it, and the question whether the payment has or has not equaled in fact what each party assumed was the real legal liability may be hereafter tried out between them.

On this branch of the case our conclusion is that the defendant rests under an obligation to pay into the city treasury a sum of five per cent of the net income of the railway of the defendant on the Ninth Avenue line, from Greenwich street up to Sixty-first street, and from the latter street to Eighty-third street, a sum of one-half of five per cent. The accounting will show how much of this sum has been in fact paid since 1880.

*Second.* The next inquiry is as to the liability of the defendant to pay the percentage upon the passenger traffic on its so-called Third Avenue line. I shall assume its own liability if it ever existed on the part of its predecessor, for it does not seem to be controverted that the defendant succeeds to such liabilities. The answer to the question depends upon the construction of the latter part of section 36 of the Rapid Transit Act. (Chap. 606 of Laws of 1875.) Prior to entering upon its discussion it will be well to state the rule which should obtain in the consideration of the statute. I do not think it is a case where a construction should be adopted that is most strongly adverse to the company assuming to build and operate its road under the provisions of the act, or any section thereof, nor is the public to be entitled as of course to the benefit of any doubt as to the true construction of the language to be found in the statute. Where privileges are granted or exemptions conferred by the legislature, in the shape of charters or grants to third parties, the grantees are to take only what is clearly granted, and they shall take nothing by implication which is not necessary for the full and fair enjoyment of the thing granted. .

The principle is quite well settled, and the only subject of discussion is whether the particular case comes within it. (*Langdon* v. *Mayor of N. Y.*, 93 N. Y. 129, 144; *Mayor of N. Y.* v. *Dry Dock, etc., R. Co.*, 47 Hun, 199; *S. C. on appeal*, 112 N. Y. 137.)

When the Rapid Transit Act of 1875 was passed the answer to the question whether the plan therein provided for would prove a success was in great doubt. Certain privileges and

franchises were provided to be given companies organized or operating a road under the act, and in return certain conditions and burdens were exacted from and imposed upon such companies. The persons who might be found willing to invest capital in the project might, in one sense, be termed "adventurers," because they would be investing their money in a scheme the result of which was then most doubtful, and which might leave them with their capital wasted, and with a costly and at the same time worthless structure on their hands. It is safe to say if at that time the interest of abutting owners had been understood to be as it has been since decided, not a railway would have been built under the provisions of this act of 1875. It is matter of public history that at this time capitalists were timid as to venturing their money in what seemed to be a somewhat visionary scheme. Some reasonable prospect of possible future profits to arise from the experiment would necessarily have to be presented before the risk would be taken. The above act was the means of testing by practical experiment the question of the feasibility of elevated railways, and the possibility of their becoming a paying investment while at the same time furnishing a satisfactory solution of the problem of rapid transit through the city.

The roads have been built under the provisions of the act, and subsequent to their building (many think in consequence thereof) the upper part of the city has grown enormously and has, in truth, become transformed from vacant swamps to streets bounded by rows of costly buildings. The roads have certainly shared in this prosperity, but the burden and effect of payment for the interests of abutting owners have been, still are and always must be felt most powerfully. The large amounts of these payments make a very strong drain upon the financial ability of the companies. That they are able to go on under the obligation and yet earn enough to make the property a valuable one is surely not a cause of regret, nor should it furnish a reason for treating the companies other than in a fair spirit. Looking at the facts as they existed in 1875 we think the act should be fairly construed like any other grant

made by the state upon consideration, and the language of the act should not be twisted out of its fair meaning, or any violent and strained construction adopted for the purpose of holding the defendant to the payment of this percentage.

The following is the text of the thirty-sixth section of the Rapid Transit Act, under which mainly the question arises :

" § 36. Whenever the route or routes determined upon by said commissioners coincide with the route or routes covered by the charter of an existing corporation, formed for the purpose provided for by this act, provided that said corporation has not forfeited its charter or failed to comply with the provisions thereof requiring the construction of a road or roads within the time prescribed by the charter, such corporation shall have the like power to construct and operate such railway or railways upon fulfillment of the requirements and conditions imposed by said commissioners as a corporation specially formed under this act; and the said commissioners may fix and determine the route or routes by which any elevated steam railway or railways, now in actual operation, may connect with other steam railways or the depots thereof, or with steam ferries, upon fulfillment by such elevated steam railway company, so far as it relates to such connection, of such of the requirements and conditions imposed by said commissioners, under section four of this act, as are necessary to be fulfilled in such cases, under section eighteen of article three of the Constitution of this state, and such connecting elevated railway shall, in such case, possess all the powers conferred by section twenty-six of this act ; and when any connecting route or routes shall be so designated such elevated railway company may construct such connection, with all the rights and with like effect as though the same had been a part of the original route of such railway."

This act contemplates three conditions under which an elevated railroad might be built : (1) A company might be formed pursuant to its provisions, and upon complying therewith it might proceed to build a road. (2) The commissioners provided for in the act might determine upon certain routes, and

if they coincided with those covered by the charter of an exist-
ing corporation, then such existing corporation shall have the
power to construct the road over those routes as if it had been
specially founded under the act, upon fulfilling the require-
ments and conditions of the commissioners. (3) The com-
missioners might fix upon and determine the route by which
any existing elevated railway then in actual operation might
connect with other steam railways, etc. The provision for
building under the second above-named condition in fact only
applied to the Metropolitan, formerly the Gilbert Elevated
railroad. That company had its charter, and instead of form-
ing a new company under the general provisions of the act,
the Metropolitan came in under the thirty-sixth section as a
company having a coincident route. It is conceded that this
company thus coming in under that section to operate a sub-
stantially rival road on the east portion of the city, was not, by
this statute, bound to pay any percentage of its income to the
city. It was to be subject to the requirements and conditions
of the commissioners, but the statute provided for no direct
burden of this kind, and none such has ever been imposed
upon any other elevated railroad in New York.

The New York Elevated Company applied to the commis-
sioners pursuant to the provisions of this same thirty-sixth
section, and those commissioners exacted from the company
as a condition precedent to their laying out any connecting
routes for that company under this section, an agreement and
consent which is fully set forth in the record. Among the
conditions therein imposed was the time within which the con-
struction should be commenced and completed, and there was
also one relating to the rates of fare which it should charge
and in regard to the running of so-called commission trains
during certain hours. These rates of fare were, in many
respects, lower than those which the West Side and Yonkers
road was authorized to charge and receive for the same service.
Another condition imposed was that the company should pay
such proportion of the expenses of the board of commissioners
as the board might designate. The conditions having been

assented to and an agreement signed by the company, the commissioners laid out the routes and transmitted to the common council their report of the conditions obtained from the company, and the common council, on September 7, 1875, duly ratified the report and gave its consent to the building of the road upon the conditions named in the agreement.   Since the time when the legislature had granted for a consideration expressed in the statute of 1867 the use of the streets of the city for railroad purposes, an amendment to the Constitution had been adopted which rendered the consent of the local authorities and also that of the owners of one-half in value of the property abutting on the streets, necessary before railroad tracks could be laid down in the streets of a city, or in lieu of the consent of the property owners, the favorable report of a commission to be appointed by the General Term of the Supreme Court and a confirmation of such report by the court.   The abutting owners in this case did not consent, and a commission was appointed as above provided for, and its report was duly confirmed and the road was built.

The claim of the plaintiff rests upon the last few words of the thirty-sixth section, viz.: " And when any connecting route or routes shall be so designated, such elevated railway company may construct such connection with all the rights and with like effect as though the same had been a part of the original route of such railway."

The argument is that the language bestows the right to build just the same as if it were a part of the original route, and if the connecting routes had in fact been part of the original route of the railroad company and built under the power granted by its charter or special laws, the road would have been also built subject to all the burdens imposed under the same authority, and among them the obligation to pay the percentage.

I do not think the plaintiff's claim is well founded.   In the first place it seems to me to be a most forced and unnatural meaning to give these words, something not called for, but, on the contrary, plainly at war with the immediate context.   The

right to build the connecting routes is plainly derived solely
from this thirty-sixth section. The language there used is a
clear grant of power thus to build upon fulfilling the condi-
tions mentioned. The section gives to the existing company,
after fulfilling the stated requirements, all the powers con-
ferred by section 26 of the same act, and then grants in par-
ticular language the power to construct such connecting road
with all the rights and with like effect as though the same
had been a part of the original route of such railway. It is
the power, not the burdens, with which this portion of the
statute is dealing. This is the language of an affirmative
grant of power, and is not such fit and appropriate language
as would ordinarily be used to express the idea that burdens
and conditions were to be thereby imposed not at all con-
nected with the power to construct. It was in terms author-
izing the construction on the routes fixed. The language did
not mean that the routes were to be constructed under the
powers given by the old acts relating to the West Side and
subject to the conditions therein imposed. It meant that the
company should have the same power to build the connecting
routes that it had had to build its old ones. It is said the
words have no useful office to perform if the plaintiff's con-
struction be not given them, because by force of the language
of the section granting to the company, upon complying with
the conditions, all the powers conferred in section 26 of the
act, the company would have, under that grant, full power to
construct its road. I think the power to build is to be found
in that section, but the draughtsman, by simply referring to
the twenty-sixth section for the powers to be possessed by the
company, did not state in terms in the thirty-sixth section
what those powers were, and it would be quite natural, under
such circumstances, to state explicitly and in so many words
that the company should specially have power to build the
road with all the rights, etc., as therein mentioned. It was
further assurance, though clothed in different language, that
in so building the connecting road the company would be
regarded as building it the same as if it had had direct author-

ity to build under its original route. The language does not mean that the company was to build upon the connecting routes under the same obligations and subject to the same burdens as if its road were built under the old statutes, because the act, while granting the right to construct the road over these connecting routes, contained within itself provisions for the imposition of conditions and burdens. The power to impose them lay with the commissioners under sections 36 and 26, already referred to, and with the city authorities. The commissioners could exact them before laying out the connecting routes, and the city authorities could do so before consenting to the construction of the road. The language used, when fairly construed, means that in building the road over these connecting routes the company should be regarded as having the same right to build them as if that right had been granted by the old statutes. This is very different from the case of *The Mayor, etc.,* v. *Twenty-third Street Railway Company* (113 N. Y. 311, 319). In that case it was held that where the defendant had succeeded to and taken all the property rights, privileges and franchises of the Bleecker Street road it took them burdened with its charter obligations. We re-affirm such doctrine here when we hold defendant liable to the burdens imposed upon the corporations of which it is the successor.

There is, however, nothing in that or any other case cited by counsel which holds that, by language such as is used in the section under consideration, the legislature while granting the power intended to burden the grant with a condition not necessarily connected with or affecting the exercise of the power granted.

We know that language is frequently used in a statute which is not really necessary and which, perhaps, is to some extent superfluous. The same idea is frequently repeated in different words. Because different language may be used it is not at all necessary to attribute a different meaning to it each time. The question is on looking over the whole context what is the true meaning of the legislature, and if it be quite

plain that the same power has in truth been given in different portions of the statute, although by the use of different language, it should be so held, instead of making an effort to give different meanings to the language, one of which it does not aptly and appropriately express.  This holds good, even though the effort is made for the purpose of imposing a burden upon a railroad corporation which it is plain was not in the contemplation of the legislature.  That it was not in the contemplation of the legislature appears to me to be true also for other reasons.  The first reason and one already given is that the language is not appropriate to impose this burden. Looking at the surrounding facts, I think the same conclusion must be arrived at.  A perusal of the whole act must, I think, convince any one that it was passed, having the three possible kinds of companies above described in view.  All of the provisions up to the thirty-sixth section are with reference to the companies to be formed under it.  The thirty-sixth provides for the building of the coincident routes by an existing company, while connecting routes were to be built by an elevated railroad company then existing and actually operating a road.  Such companies were to go on and construct their respective roads along the routes and operate them under the same act, and in the language of Judge EARL in the *Elevated Railroad Case* (70 N. Y. 327, 353), these various corporations were "simply placed on a footing of equality with new companies which may be formed under the act."  As to the new roads which were to be built under the special grant of power coming from the Rapid Transit Act, it is impossible to think that the legislature meant to discriminate in favor of or against any road coming under the act.  The whole spirit of the act is to treat all alike and not to impose conditions or limitations upon one which would operate unfairly and as a special burden upon it when compared with the other company which was very likely to be a rival looking to substantially the same population for support.  This would be manifestly unfair.

It is conceded that no obligation of payment on income has

ever been imposed upon any other road under the Rapid Transit Act of 1875, and the claim here is worked out at the expense of the fair meaning of the language used.

·Other considerations are not wanting. The burden of the payment of the percentage was originally imposed upon the Yonkers Company as a consideration for the use of the streets which the legislature granted. It is unnecessary to hold that this meant the use of the streets as against any rights of abutting owners as well as the city. For this purpose it can be confined to the use of the streets as against the city only. This at least was in terms granted. Since the passage of that act the amendment of the Constitution has been adopted prohibiting such use without the consent of the city authorities. If this language of the thirty-sixth section operates to impose this percentage burden upon defendant, it rests upon it without the grant of the use of the streets for which use the payment formed the consideration in the former case. The burden is the same but nothing is secured to the defendant on account of its being thus imposed. Could this have been intended? And if so, then we find the company under the necessity of making this payment in any event and also bound to submit to such other and further conditions as the commissioners or city authorities should see fit to impose before they would lay out and determine the connecting routes contemplated by the act or consent to the laying of the tracks thereon. These conditions could be made as to the payment of a percentage and as to rates of fare as well as in regard to other matters. Such a company would be at the greatest disadvantage, for by reason of the percentage burden it might be unable to compete upon the same terms which might be imposed upon the coincident routes company and thus it would be treated unjustly. We do not think that a construction which would permit such injustice would be the correct one. The commissioners or the city authorities or both would have the subject entirely under control, and they could impose such conditions as they thought appropriate before laying out the routes or before granting consent to construct

the road.   In this way provision would be made for all inter-
ests and all would probably be treated alike.

Again, the rate of fare allowed by the old statute for the
Ninth Avenue route could be materially reduced with regard
to the road to be built by the exercise of this power to consent
upon condition as already stated.   The power was, in truth,
used by the commissioners and the city authorities, and so the
defendant had to consent to the reduction before it could
obtain the authority to build.   Thus, the section of the statute
in granting the right to build upon the connecting routes, with
all the rights and with like effect as if part of the original
route, must be held not to mean what it is contended to mean,
at least to the extent claimed.   If it is meant to give all the
rights literally then the company would have the power to
charge the rates of fare provided for in the statute of 1867 or
1875, and the plaintiff so assumes and argues that in consent-
ing to take less the company consented to a condition which
the commissioners had no right to impose.

We think the commissioners or the city authorities had the
right to impose conditions upon that as well as other subjects
concerning the building of the road, hence "all the rights"
were subject to modification by the action of those bodies.
Not having "all the rights" certainly the special burdens
should not be imposed by a mere implication.   The commis-
sioners having full power in the case of the defendant's pred-
ecessor to consent to lay out the routes upon such conditions
as they might think appropriate and such as they could impose
in the case of companies who were to build coincident lines,
why should an unnatural construction of the last two or three
lines of the section (36) be resorted to for the purpose of hold-
ing defendant to this five per cent obligation on the Third
Avenue route when none such was or ever has been imposed
in the case of the other railroads which have been erected and
operated under and by virtue of the provisions of the Rapid
Transit Act?

There is another reason why the language used cannot be
given the literal meaning claimed for it.

The provision assumes to give all the rights, and with like effect, as if the route had been a part of the original route. All the rights would include the free and unconditional use of the streets of the city, as given by the former statutes, and without the consent of the city authorities, and for no other compensation than the five per cent payment. Yet this, it is conceded, cannot be done, because of the constitutional amendment, and, therefore, this clause in the statute must be so read as to mean that the company is to have all the rights which may remain after the commissioners shall have announced the conditions upon which they will fix and determine the routes, and the city authorities shall have given their consent upon their own conditions and the consents of the proper number of property owners shall have also been given. In granting rights which are thus made wholly uncertain as to their nature and extent, and which are incapable of enumeration until after the above-mentioned determination and consents have been made and given, can it be possible to plausibly contend that the legislature, while affirmatively granting a power, yet by the use of these words, " with the same rights and with like effect," nevertheless meant to impose a burden to which no other company taking rights under the act was subjected ? It is seen that " the same rights were, in truth, not given. Why should burdens be imposed when rights were lessened ? We think our construction of the words is much more plausible and much nearer the real intention of the legislature itself.

Conditions might be imposed before fixing these routes, and, indeed, in this very case they were imposed, which are inconsistent with the exercise of " all the rights " under the other statutes, the rates of fare being a very forcible example.

It is said the commissioners had no right to impose any condition as to rates of fare, and that they knew it, and, therefore, obtained an agreement as to the fare from the company. I deem the manner in which the rate of fare is established to be of small importance, whether by imposing such rates in the first instance, and as a condition upon which the route is fixed and determined, or by saying to the company : If you do not

agree we will not fix the routes.  It is found here that these conditions were imposed upon the company in the way of an agreement by it, but it was made a condition precedent to marking out the routes.  And we think the commissioners had the right to demand such an agreement as a precedent condition.  It is also worthy of remark that the commissioners, while evidently assuming jurisdiction over the whole subject of the conditions and exactions upon compliance with which they would proceed to fix and determine these routes for defendant's predecessor, and while exacting from it an agreement which it is seen covers the whole general subject, never placed this burden upon the company, nor can it be seen by any writing or evidence upon the subject that such burden was supposed to exist.

Upon the whole statute and in light of the surrounding facts known to the legislature at the time, we cannot but think that the construction of this section, as contended for by the plaintiff, is strained, unnatural and incorrect.  There can be no fair reason assigned for any distinction between the rights of these various companies granted under this act to the disadvantage of the defendant's predecessors.

Finally, it is said that the defendant ever since 1879 has recognized its liability to pay this amount, and in fact has paid what it claims is a sum equal to the five per cent up to the time of the commencement of this action.  Practical construction of the parties, it is claimed, makes the claim of plaintiff valid.  I do not attach the same importance to the fact of payment that the plaintiff does.  There must be at the bottom some statutory liability of defendant, or else it is not obliged to pay the amount in the future.

In relation to the obligation to pay on the Ninth Avenue route, it was placed in the act of 1867, which was concededly valid.  The method and time of payment were thereafter prescribed by the act of 1868, which defendant consented to obey and waived the right to defend on the ground of its invalidity.  But here there is no statute which authorizes the exaction, however mistaken the parties may have been in

regard to its construction. There has never been any statutory authority for its payment, and there has been nothing for the the defendant to waive. The payment has been purely gratuitous. If the statute were ambiguous enough to allow a fair and rational doubt as to how it ought to be construed, and the construction actually given it by the parties were as near the true one as any could be said to be, in such case it might be the inclination of courts to construe it in accordance with such practice of the parties. In this case, however, we do not feel that the act can be fairly or naturally construed in the way plaintiff claims.

This leads to a reversal of the judgment as to the Third Avenue route.

*Third.* The counterclaims of the defendant we do not think can be allowed. There was never any warranty in regard to the free use of the streets by defendant as against abutting owners. On the contrary, the very act under which defendant claims the right to recover the sums paid to abutting owners, provides for the payment thereof by the company. (Sec. 11, act of 1867.) The amounts heretofore paid by defendant cannot be recovered back as involuntary payments within any principle, and the plaintiff is entitled to retain the same. There has been no mistake of fact under which payments have been made, and the defendant must remain where it is in relation to moneys paid heretofore.

We express no opinion upon the proper construction of the expression "net income," but leave that for decision when it necessarily arises. The accounting can go on if necessary, and upon it full evidence may be given so that a decision as to the true meaning of the expression may be arrived at in the light of all the facts surrounding the discussion which it may be material to know.

For the reasons above given the judgment should be reversed and a new trial granted, with costs to abide the event.

GRAY, J., (dissenting). I agree with Judge PECKHAM that the defendant should be held to the obligation of paying into the

city treasury five per cent of the net income from the operation
of that portion of its railroad, which is commonly called the
Ninth Avenue line. That obligation is certainly enforcible upon
the theory expressed in his opinion.    I think it perfectly clear
that the subsequent acquiescence by the West Side, etc., Rail-
road Company and of its successor, the New York Elevated
Railroad Company, in the directions for payment, contained in
the act of 1868, was equivalent to a consent that they should
become part of the compact with the state, which regulated
its corporate life, and that they should constitute the rule in
making the statutory payments.    However grave the objec-
tions to the act of 1868, upon constitutional grounds, the pro-
visions of its second section related merely to the manner of
paying the fixed percentage.    The burden of payment was
already imposed by the act of 1867, which left for future
legislation a matter of detail, as to the manner and times of
making the payments.    When, subsequently to the passage of
the act of 1868, the predecessors of the Manhattan Railway
Company made payments of percentages, at stated times, into
the city treasury ; in legal effect, there was an adoption of the
directions of that act, as a regulation of the discharge of the
corporate obligation ; and the charter then stood as containing
as complete an obligation, with respect to such payments, as
though the act of 1867 had, in terms, fixed their manner and
times.

But I cannot agree with the conclusion that, as to its
so-called Third Avenue line, the defendant and its predecessor,
the New York Elevated Railroad Company, were exempted
from this general charter obligation.    I consider that the con-
dition of liability being once established, with respect to the
original route, it inevitably and logically follows that that con-
dition continued with respect to all extensions, or connecting
routes built by the New York Company, unless and until
relieved by competent and certain legislative action.    Any
other view of the question seems without any justification
upon legal grounds, and must be influenced by some quite
unwarrantable notion, or sentiment, of injustice to the defend-

ant.   After the many years of acquiescence by the defendant and its predecessor in the understanding that the obligation to pay the percentage, imposed by the original act of incorporation, continued with equal force as to new routes, extending their railway, built through the permission given by the Rapid Transit Act of 1875, I think it is altogether too late to indulge in sympathy, or to rest the discussion of the case upon any notion of injustice.   It never occurred to the defendant that it was suffering from any unjust and illegal burden, until after the lapse of some twelve years from the construction of the Third Avenue line; and, in fact, a careful and candid consideration of the statutes and of the facts should dispel any doubt as to the justice of holding it to an obligation imposed by law and most willingly assumed.   It will conduce to a clearer understanding of a question, which is of very great importance to the city of New York, if we consider what was the general situation at the time of the passage of chapter 606 of the Laws of 1875, or, as it is usually referred to, the "Rapid Transit Act."   When that act was passed, the New York Elevated Railroad Company had acquired by purchase, upon foreclosure and upon sales, the property and franchises of the West Side and Yonkers Patent Railroad Company, and was operating its elevated railroad from the Battery, through Greenwich street, to and through Ninth avenue to Thirtieth street, and solely by virtue of the franchises so acquired.   It was the only elevated steam railway in actual operation in the city, and, but a day before the passage of the Rapid Transit Act, the legislature had passed chapter 595 of the Session Laws, which confirmed it in its possession of the rights and franchises acquired; authorized and required it to continue and complete elevated railroads, and regulated the construction, operation and management thereof.   There was one other corporation in existence at that time, formed under an act passed in 1872, for the purpose of operating an elevated railway, and that was the Gilbert Elevated Railroad Company. Its charter gave it the right to build a tubular elevated railway upon and southerly from Sixth avenue; but it had done

little, if anything, in the direction of carrying out the char-
tered project.   Amendments to the Constitution of the state,
which went into force on January 1, 1875, stood in the way
of any legislative action, looking to the extension of the New
York Elevated Company's Ninth Avenue line beyond the
routes fixed for it on the west side of the city.   In that con-
dition of affairs the Rapid Transit Act was passed — in form
a general law, or scheme, authorizing elevated steam railways
in the city, upon routes and under articles for the incorpora-
tion of companies, to be determined and framed by commis-
sioners appointed by the mayor.   Being, for the generality of
its application, saved from the constitutional inhibition, the
act, nevertheless, was, plainly enough, in the interest of the
existing New York and Gilbert Elevated Companies, and its
thirty-sixth section was inserted to cover the case of each.
That section provided, in the first place, for any existing cor-
poration, the routes of which coincided with the routes laid out
by the mayor's commissioners, and empowered it to construct
and operate its railway as a corporation specially formed under
the act.   That met the case of the Gilbert Company, and it
availed itself of the privileges granted, and changed into an
open steam railway, upon the routes determined by the mayor's
commissioners coincident with its routes.   It subsequently
became the Metropolitan Elevated Railroad Company.   The
intended application of the first part of this thirty-sixth section
to the Gilbert Company, as the only one having coincident
routes, is not disputed by Judge PECKHAM, and was so assumed
by CHURCH, Ch. J., in his opinion in the matter of that com-
pany.   (70 N. Y. at page 368.)

In the second place, that section provided that the mayor's
commissioners might fix the routes by which any elevated
steam railway, then in actual operation, might connect
with other steam railways, or their depots, or with steam
ferries, and concluded in this language : " And when any con-
necting route   or   routes   shall be   so   designated, such
elevated railway company may construct such connection,
with all the rights and with like effect as though the same had

been a part of the original route of such railway." This second provision of the section, as plainly, applied to the case of the New York Elevated Railroad Company; for that was the only "elevated steam railway in actual operation." That company made immediate application and, within two years, received final authority, through an order of the court, to proceed and construct the extension of its route from the Battery, by the south end of the city, through various streets to and through the populous thoroughfare of the Third avenue; all which rights it obtained upon the pretext and theory that, by such an extension of its route, it was enabled to connect with the various ferries and railway depots on the east side of the city. It cannot very reasonably be doubted but that the Rapid Transit Act was promoted by these two companies; which, under cover of an apparently general act, through this brief thirty-sixth section, were enabled to do that which they could not have gained authority to do through a special legislative enactment. The question, then, is whether, having gained this valuable and practically exclusive privilege, there was also secured the additional grant to the New York Elevated Company of an exemption from the obligation, imposed by previous legislation, of paying a percentage to the city as a consideration for the use of the streets. If it did, where is the language of exemption, and what shall we do with the apparently stringent language with which section 36 concludes? An argument is sought to be founded upon supposed effects upon the corporation, coming in under the provision of the section, of conditions, requirements and processes mentioned in the act — effects which are dwelt upon in Judge Peckham's opinion. It is suggested that the effect upon the New York Elevated Company, of having passed through the machinery of the Rapid Transit Act, was to make it, as to its new powers, and their exercise in the construction and operation of the new routes, independent and to relieve it from the legal obligation attaching to the operation of its original route. But any such proposition spends its force against the stubborn resistance of the facts and of the language, with which the legislature

concludes its grant of power to the applicant, under the section ; which is couched in the form of a limitation and which differentiates it from a corporation formed under the act itself. That the legislature meant something when providing that it " may construct   *   *   *   with like effect as though the same had been a part of the original route of such railway," we may not deny.   What was the " original route " of the New York Elevated Company, and what were its duties and obligations, the legislature well knew ; for the previous day had witnessed the passage of chapter 595 of the Laws of 1875, which had confirmed the company in the possession of the properties, franchises and rights acquired from the West Side Company, " as they were granted " to that company.   If we hold that the New York Company and its successor, the Manhattan Company, came under the obligation imposed by the act of 1867 upon the West Side Company, and, if, under section 36 of the Rapid Transit Act, the new connecting routes were to be constructed " with like effect," as though " a part of the original route," how can we escape, by sensible processes of reasoning, the conclusion that the legislature meant to provide that whatever, by the law regulating its existence, was imposed upon and required of the company, with respect to the city, whose streets were to be used, in the operation of its original route, should still be a condition of its right to exercise its new power to construct the connections or extensions of that route ? The New York Company so understood the matter ; as we see evidenced by its continuing to pay the five per cent for the many years after it had constructed the new, or Third Avenue route.

The Rapid Transit Act, in its bearing upon the New York Company, was but an enabling act.   These connections of the New York Company, under which description it was enabled to build its present Third Avenue line, are in fact parts of its original route.   Had the legislature, by mere amendment of the acts, under which the New York Company became authorized to operate its Ninth Avenue line, further empowered it to build and operate these connections, would any doubt

have existed as to the continuance of the obligation to pay the percentage to the city? Certainly not. Then how has the section of the Rapid Transit Act in question created any such doubt? It is very evident that Judge PECKHAM's consideration of the question was influenced by the belief that, though the right to build connecting routes is derived solely from the thirty-sixth section, its language could not mean that the burden imposed under the old statutes continued, "because," he says, "the act * * * contained within itself provisions for the imposition of conditions and burdens. The power to impose them lay with the commissioners," etc. But that is altogether a mistaken reading of the act. The New York Company was not compelled to forego, or to change, any of its corporate environments of powers and privileges, in order to come in under the act and to avail itself of the further privilege extended to it. Though the power to construct these connections with the original route flowed from the provisions of the Rapid Transit Act, the right to avail itself of the privilege resided in an existing corporation, whose powers and obligations were already defined and regulated. The act conferred no power upon the mayor's commissioners to impose any conditions upon it whatever. That power they did have with respect to the other class of companies, referred to in the section; such as the Gilbert Company. With respect to them, their power to construct and operate an elevated railway was made to depend "upon fulfillment of the requirements and conditions imposed by said commissioners;" but, with respect to the class of elevated roads in actual operation, of which the New York Company was the sole representative, the only power conferred upon the commissioners to impose requirements or conditions was "under section 4 of the act;" and they were such "as are necessary to be fulfilled in such cases under section 18 of article 3 of the Constitution of the state." Reference to section 4 of the Rapid Transit Act shows that no power is there conferred upon the commissioners to impose any conditions, which were not already imposed by the Constitution.

That section (4) simply provides that the mayor's commissioners shall, if they find such railways necessary, within a certain time after organization, determine upon and locate routes for the railways through the streets, etc.; except Broadway and Fifth avenue below Fifty-ninth street, and Fourth avenue above Forty-second street, and except such portions of streets, etc., as are legally occupied by any elevated or underground railroad in actual operation; provided the consents of property owners and of the local authorities be first obtained, or, in lieu thereof, the determination of commissioners appointed by the Supreme Court, etc.

Section 18 of article 3 of the Constitution, referred to in the thirty-sixth section, simply inhibits the legislature from authorizing the construction of street railroads, without the consents or determination of commissioners described in section 4; which has simply embodied the constitutional language. This is all the force of the reference in the language of that section of the act, which permitted connections to be constructed by elevated steam railways in actual operation " upon fulfillment   *   *   *   of such of the requirements and conditions, imposed by said commissioners under section 4 of this act as are necessary in such cases, under section 18 of article 3 of the Constitution of this state." Can it, with any semblance of reason, be asserted that, by force of that reference in section 36, the commissioners were given any power to impose requirements or conditions upon the New York Elevated Company, except as to matters already provided for in the Constitution? And, yet, that is the only language in the act, applicable to the case of the New York Company, which refers to the existence of a power in the commissioners to impose conditions. Compare the provisions as to the class of elevated railways in actual operation, desiring to make connections, with the previously described class, of which the Gilbert elevated was the representative, and a discrimination is evident; for in its case the commissioners were empowered to impose such conditions and requirements as

they could in the case of a corporation specially formed under the act.

The Rapid Transit board of commissioners were distinctly advised by their counsel, in an opinion which is printed in this record, that they could only deal with the existing corporation in actual operation, by fixing connecting routes, and that section 36 made a sharply drawn distinction between the case of the special companies by that section contemplated and the new companies in terms provided for. The commissioners, however, were in a position where they might refuse to act harmoniously in fixing connecting routes, and they could request, as a condition of their acting upon the application of the company, that it should agree to some things. The company was, however, under no obligation to submit to any conditions the commissioners might dictate. Though the act, as we readily appreciate, was passed for its benefit, it was free to decline taking any action under it to make connections, if too exacting demands were made by the commissioners or by the city officers. But the company had a clear conception of the situation and was perfectly willing, if not anxious, in order to obtain the necessary official action of the commissioners, to make concessions.

The Rapid Transit Act was passed June 18, 1875. At a meeting of the board of directors of the New York Company, which must have been held very soon afterwards (before September), resolutions were passed to the effect that, in consideration of the fixing by the Rapid Transit commissioners of routes for connections with depots, etc., as heretofore applied for and designated by the company, or such as the company would accept in lieu thereof, the company would agree to construct certain specified portions of these routes, before or by specified dates; to charge fares at specified rates upon such connections; to run "commission" trains; to construct a single, double or treble track road, according to certain localities, and to pay a reasonable proportion of the expenses of the commissioners. This was its voluntary agreement, conditioned upon an acceptance of its previous designation

of the routes it wished to construct upon    At a meeting of the commissioners, on September 2, 1875, these resolutions were offered, and the board, thereupon, " in consideration of the stipulations, agreements, etc., of the New York Elevated Company," proceeded to fix and determine the routes for that company, as applied for.    On September 7, 1875, the common council of the city, acting upon the full report of the above proceedings, passed a resolution consenting to the routes reported upon by the rapid transit board.    It is very remarkable that, with all the particularity with which the company framed its resolutions and with which they were acted upon, there should be nothing said upon the subject of its release from the payment of this percentage.

But if the commissioners were without power to impose any conditions, other than such as the Constitution contained ; or to require anything, other than the company might by voluntary agreement assent to, and if the language of the section (36), under which the privilege was extended to the New York Company to extend its original route by connections, etc., is to be construed as without direction upon the subject of the liability to pay percentage, the question again presents itself ; how did the company gain an exemption from that burden ? Its independence was not affected by the act and what it received under its provisions was a mere enlargement of the right to construct railways in the streets of the city.    The commissioners stood there, not with any power to impose conditions, but simply with power to determine upon connecting routes and to require from the company the formal expression of its assent to the constitutional requirements, referred to in section 4.    That was the extent of their power over the applicant ; though, of course, they could negotiate any agreement between the city authorities and the company, as a condition of an exercise of their limited powers.    It is sought to explain away the force of the words, with which the grant of power to construct connecting routes concludes, by treating them as words of further assurance as to the authority to build, and by regarding them as, in reality, unnecessary and superfluous. But the objections to these views are too grave.

The grant to the corporation of the powers conferred by
section 26 of the act was not necessary, simply to enable it to
construct and operate an elevated railway ; but it was deemed
necessary, or wise, that every doubt should be removed as to
its right to operate an elevated steam railway.    In the original
act the motor power was to be by a propelling cable, and the
change in the motor power, authorized by the subsequent act,
was made dependent upon the approval of the commissioners ;
who, under those acts, were appointees of the governor.    By
force of the grant in the thirty-sixth section of the powers con-
ferred by section 26, the New York Company was relieved of
any question upon the subject of its right to operate an ele-
vated steam railway.    It needed no reference to the powers in
section 26 to enable it to construct and operate the proposed
connecting routes.    That right was expressly granted in sec-
tion 36 and all other requisite corporate powers were already
possessed under the General Railroad Act of 1850, or by vir-
tue of its purchase, etc. ; with the possible exception, or doubt,
as to the power to use steam as a motor, without having first
obtained the consent of the governor's commissioners.    I think,
unless we construe the language, in which this grant of power
to construct connections is couched, as working a discrimina-
tion against the company, that its existence in the section is
reduced to an absurdity.    If it is read as continuing the exist-
ing legal obligation and as making it co-extensive with the cor-
porate rights of the company in its added field of operation, it
receives a sensible and forceful meaning.    In empowering the
company to construct a connection " with all the rights and
with like effect as though the same had been a part of the
original route," the language is confirmatory of the existing
obligation of the company, and of those corporate rights which
were necessary to be possessed for the construction and opera-
tion of an elevated railway.

If we regard the exact situation, we cannot fail to see the
fallaciousness of the idea that any transformation was occa-
sioned, or that any change in the corporate obligation of the
New York Company resulted, when, in consequence of its

application, certain connecting routes were fixed by the commissioners. Any confusion of ideas on that head must be occasioned by the supposition that, through the proceedings, which resulted in the connecting routes being accorded and fixed, the New York Company was so affected, through the imposition of conditions and of requirements under the act, as to give to it a separate set of rights, and that it must have been the intention of the legislature, because thereof, to sever the obligation affixed to the operation of the original route. But, as it has been shown, the permission to build connecting routes came from the legislature, unaccompanied by the imposition of a single condition not already in the fundamental or general law. The whole right to build further was conferred solely by section 36 and that section neither affixed, nor authorized the affixing of, one requirement beyond the necessity of obtaining the consents mentioned in the Constitution, and did not subtract any burden imposed by the charter of the existing corporation. In a court of law we are bound to give effect to the words of the statute, and, if they are susceptible of a reasonable application, we cannot say that they are meaningless, nor dismiss them as superfluous. These words had a place and they had a mission to perform. If we say they do not subject the corporation, in this material respect, as it was subject before, then I think we utterly disregard the evident purpose of their insertion. What other reasonable construction can we give to this legislative enactment, than as a provision authorizing the company to build the connecting routes, when and as fixed by the mayor's commissioners, as though they had been named as a part of its route in the previous legislation? It did not come in under the act as one of the companies it was designed for creating and it was not subjected to the imposition of any of those requirements or conditions at the hands of the commissioners, to which the other mentioned companies were. It simply availed itself of the permission extended by a provision of the act to extend its original route and whatever requirements, whether by the commissioners or by the city authorities, it came under, was

the result of its express consent thereto, and, in no conceivable sense, the result of any condition in the provision of the act.

The constitutional amendments then in force prevented such a grant of power by way of an amendment to the charter and the difficulty was overcome in the legislature by adding section 36 to the Rapid Transit Act ; which, being considered as a law general in its application to existing companies, was held not to be in conflict with the Constitution. (*Matter of N. Y. Elevated R. R. Co.*, 70 N. Y. 327.) In the case cited, it was suggested of section 36 that its purpose and effect were to bring existing railroad corporations within the general scheme devised by a general law, and it was very forcibly intimated that the enactment of the section was a way adopted by the legislature " to circumvent the constitutional provision without violating it." (P. 353.) In that and the succeeding case of *The Gilbert Elevated R. R. Co.* (70 N. Y. 367), it was, evidently, considered as to the two existing companies, which availed themselves of the provisions of the Rapid Transit Act, that that act simply recognized and regulated the right already possessed to build and to operate an elevated railway.

It is said that the act placed existing companies on a footing of equality with new companies, to be formed under its provisions, and the *Matter of N. Y. El. R. R. Co. (supra)*, is cited as authority for this view. But the remark was made, in that case, with respect to the equal right of the New York Company, with the companies to be formed under the act, to apply for connecting routes and to meet the argument that section 36 was violative of the Constitution, as being, with respect to that company, a grant of an exclusive privilege, etc. (See pp. 347, 348, 351–353.) No other inference from the remark is fair or warrantable. That the existing company, availing itself of its provisions to make extensions of its route to connect with other railways, or with ferries, was intended to be relieved of any legal obligation connected with the franchise, of the nature of the one in question, is distinctly negatived, in my judgment, by the absence of appropriate

language to accomplish that result.   Any possible inferences that equality of burdens was intended to be conferred become impossible in the presence of the last clause of the thirty-sixth section.

But, it is argued, if the thirty-sixth section operates to impose this percentage burden upon the defendant, it rests upon it without the grant of the use of the streets; for which use the payment formed the consideration under the original act.   The argument refers to the change of conditions worked by the amendment to the Constitution, which prohibited the use of the streets without the consent of the city authorities. I cannot see much point in that argument.   While, previously, the consent of the legislature was necessary to be obtained to use the streets; by the adoption of the constitutional amendment, it became necessary to obtain the consent of the city authorities.   But, in either case, the reason for the payment of a percentage was the same.   It was the consideration for the proposed use of the streets, as determined upon by the legislature, and was obligatory at all times.   There is no injustice, (and none such was ever imagined by the company), in construing section 36 as continuing the burden of the percentage, although the legislature could not grant the use of the streets.   The right to consent to the use of its streets was in the city; but the consideration for that use remained, as to the New York Company, as it had been imposed by the legislature, for all time, or until competently exempted.   I fail to perceive any force in the argument based upon the injustice of implying a continuation of the obligation.   It is not necessary for us to imply.   The obligation was removed, or it continued, and the language is plain enough to read in it the continuation of the obligation.   Ample reasons existed for it. It was the only elevated steam railway in actual operation in the city, and, through the provision of the section, the company became enabled to extend the operation of its railways through the more populous and busy portions of the south and east sides of the city and to get the immense passenger traffic, offered by the East river ferries and the great railroad

·depots. It was not so unjust a discrimination for the legislature to make against a railroad company, standing equipped and designing to enter upon that profitable territory at ·once. If a previously existing burden seemed to be expressly ·continued by the legislative provision, the company dealt with the commissioners and the city authorities with full knowledge. The company plainly enough understood that the obligation continued and was most willing to accept the few new conditions demanded. It evidently did not see any of that inconsistency in the city's holding it to its obligation, which is now commented upon. It did not consider the burden an unequal one to bear, or an unjust or illegal one; for it hastened to construct under the power given, and, upon completion, commenced and continued to pay the percentage upon income for upwards of twelve years afterwards. The conduct of the company in paying this percentage to the city, subsequently, is a feature of the case of too serious an importance, as a practical construction placed upon the section by the parties, to be disregarded. It might not avail, if there was no foundation in the statute for a liability, to create one; but it proves, in a debatable case, what the parties understood to be the nature of their legal relations, .and that the burdened party deemed itself under, and was willing to accept of, the burden. It is plain that the present contention is a theory, devised in after years to defeat this obligation to the city. Shall we refine away by logical subtlety what was the practical view taken by the parties of the agreement and of their contractual relations? If we do that, will we feel any confidence that we have taken the correct and just view of their engagements? It seems to me that we should put away impressions. We should accept the ·co-temporaneous construction as given by the parties and which is directly antagonistic to the present claim. It seems to me undeniable that in so doing we shall accomplish that exact justice, which is demanded and expected of this court, and which it has aimed always to mete out.

I am unable to see the force of the argument of an unfair

discrimination.  The only other company is the Gilbert, or Metropolitan, and, as between it and the New York Company, a legislative discrimination existed always.  The former company, when incorporated in 1872 (five years after the West Side, etc., Company), had no percentage burden imposed upon it.  It is no answer to say that there is a discrimination worked by continuing the burden, when it is plain, upon the face of the act, that the New York Company was intended to be discriminated against, in respects to which I have alluded.

For the reasons thus generally stated, I think the judgment below was right and should be affirmed, with costs.

BARTLETT, J. (dissenting).  I agree with Judge GRAY.  The reversal of this judgment is a great injustice to the city of New York.

I find it impossible to read the Rapid Transit Act of 1875, in the light of the proceedings which have taken place under it, without coming to the conclusion that its object was not only to circumvent the Constitution, under the guise of a general law, which prohibits the legislature from passing a private or local bill granting to any corporation, association or individual the right to lay down railroad tracks, and that its further design was to secure to existing corporations, by indirection, franchises of vast value.  It is urged in the prevailing opinion that it is impossible that the legislature meant to discriminate in favor of or against any road coming under the act.  This suggestion springs from the fact that the Metropolitan or Sixth Avenue line is not subject to the tax of five per cent.  The answer is that the legislature when it enacted the thirty-sixth section of the Rapid Transit Act presumably supposed it was dealing with the subject of allowing an existing corporation to connect its line with railway depots and ferries, and so it declared that said corporation might construct such connection with all the rights and with like effect as though the same had been a part of the original route of such railway.  Had the New York Elevated Railroad Company, in pursuance of this authority and under a reasonable construc-

tion of the statute, built spurs or branches to various ferries and depots, the said thirty-sixth section contemplated that its increased earnings would be subject to the five per cent tax precisely the same as if such connections had been a part of the original route. It certainly was not within the contemplation of the legislature that the brief and general phraseology of this thirty-sixth section would confer upon the New York Elevated Railroad Company the right to construct an elevated railway system from South ferry through the Bowery and Third avenue to Harlem, running blocks away from depots and ferries, embracing one of the most valuable franchises on Manhattan Island, and being in fact an independent line on the east side of the city. It is inconceivable, if such had been the legislative intent, that apt language would not have been employed in dealing with a matter of such paramount importance. The New York Elevated Railroad Company having, however, secured the right to construct and operate the Third Avenue line, as a connecting route to depots and ferries, under a strained and unnatural construction of the thirty-sixth section of the Rapid Transit Act, it follows that the company and its successors in interest are estopped from denying that such connecting route is a part of the original route of its railway. This being so it follows that the net earnings of the Third Avenue line are just as much subject to the five per cent tax as those of the Ninth Avenue line.

There is every reason why this tax should be paid; there has been waiver on the part of the company by years of payment of the tax; there has been a practical construction of the statute in favor of the city's claim; and lastly the fair and reasonable reading of the thirty-sixth section of the Rapid Transit Act of 1875 requires it.

The judgment appealed from should be affirmed.

All concur with PECKHAM, J., except GRAY and BARTLETT, JJ., who read for affirmance, and ANDREWS, Ch. J., who concurs with them.

Judgment reversed.